IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GARY DEBENEDETTO, | ) |
|     Plaintiff, | ) |
| | ) No. 13-cv-07604 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| ANTONIO SALAS, et al., | ) |
|     Defendants. | ) |

**MEMORANDUM OPINION**

After multiple periods of incarceration at the Metropolitan Correctional Center ("MCC") in Chicago, Illinois, Plaintiff Gary DeBenedetto filed this civil rights suit pursuant to 42 U.S.C. § 1983 against various MCC officials. Defendants previously moved to dismiss DeBenedetto's fifth amended complaint or, in the alternative, for summary judgment based on DeBenedetto's failure to exhaust his administrative remedies. The Court denied Defendants' motions, finding that the issues could not be resolved without an evidentiary hearing pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008). For the following reasons, the Court now concludes that the MCC's administrative remedies were unavailable to DeBenedetto and therefore he is excused from the exhaustion requirement.

BACKGROUND

On April 11, 2012, DeBenedetto was arrested and initially detained at the Federal Correctional Institution in Milan, Michigan. He was then transferred to the MCC in downtown Chicago on July 16, 2012. Three days later, on July 19, 2012, MCC officials moved DeBenedetto from the general population into solitary confinement in the special housing unit ("SHU"). DeBenedetto claims that his mental health deteriorated rapidly while he was in solitary

confinement. Then, in January 2013, he was transferred to the Federal Medical Center Butner ("Butner") in North Carolina, where he was housed in the general population rather than solitary confinement. DeBenedetto returned to the MCC in June 2013, where he was immediately again assigned to the SHU.

In October 2013, DeBenedetto filed the present lawsuit against various MCC officials, alleging violations of his constitutional Due Process and Eighth Amendment rights pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). (Dkt. No. 1.) DeBenedetto was transferred back to Butner in July 2014. And in August 2014, criminal charges against DeBenedetto were dropped after he was found incompetent to stand trial. But federal authorities continued to hold DeBenedetto in civil commitment. Two years later, DeBenedetto was transferred to the Federal Medical Center in Rochester ("Rochester") in Rochester, Minnesota for increased care. He was released for a short time in 2019, but has since returned to federal custody.

In 2020, this Court declined to dismiss DeBenedetto's lawsuit for failure to exhaust his administrative remedies, finding that there were genuine disputes that required an evidentiary hearing. (*See* Mem. Op. & Order, Dkt. No. 144.) Specifically, the parties disputed: (1) whether MCC officials made DeBenedetto aware of the MCC's grievance procedures; (2) whether DeBenedetto ever asked for grievance forms and was refused; and (3) whether DeBenedetto was capable of navigating the MCC's administrative grievance procedures. With respect to the second of those issues, DeBenedetto's most recent complaint alleges that on multiple occasions at the MCC, he asked Defendant Correctional Officers Herman Hoover, Raphael Brownfield, and Errol Matthews for grievance forms, but they refused his requests. (Fifth Am. Compl. ¶ 77, Dkt. No. 85.) Those correctional officers all submitted affidavits in support of their summary judgment

2

motions, attesting that they did not recall DeBenedetto ever asking them for grievance forms. (*See* Brownfield & Matthews's Statement of Facts, Ex. 7, Decl. of Raphael Brownfield ¶ 3, Dkt. No. 99-1; *id.* Ex. 8, Decl. of Errol Matthews ¶ 3, Dkt. No. 99-1; Hoover's Statement of Facts, Ex. 9, Decl. of Herman Hoover ¶ 3, Dkt. No. 105.)

On February 9 and 10, 2021, the Court held an evidentiary hearing on the exhaustion issue pursuant to *Pavey*. (*See* Dkt. Nos. 165, 166.) The parties submitted a stipulation in advance of the *Pavey* hearing, agreeing that DeBenedetto never actually exhausted the MCC's administrative remedies. However, DeBenedetto insists that those remedies were not available to him. Four witnesses testified at the two-day hearing: (1) DeBenedetto; (2) Correctional Counselor Tondolaya Blisset, who retired from the MCC after DeBenedetto filed his lawsuit; (3) Correctional Counselor Michael Wright, who also retired from the MCC after DeBenedetto filed his lawsuit; and (4) Dr. Jason Victor Dana, the Chief of Psychology Services at the MCC, who treated DeBenedetto when he was incarcerated there. The following summarizes the evidence adduced at the hearing.

I. **Correctional Counselors Blisset's and Wright's Testimonies**

Blisset became a correctional counselor at the MCC in 2008 and worked there until her retirement in November 2020. Wright became an MCC correctional counselor in 2006 and retired in June 2020. Blisset and Wright both worked at the MCC during the periods when DeBenedetto was incarcerated there. Blisset testified that she remembered DeBenedetto's name from his time at the MCC, but she did not remember his face and would not have been able to pick him out of a lineup. By contrast, Wright recalled that at some point he was DeBenedetto's assigned counselor and testified that he remembered DeBenedetto.

Blisset described her job as a correctional counselor as being the go-to person for inmates. She handled inmates' intake processes, disciplinary issues, and educational programs, and also fielded inmates' complaints and questions. Blisset testified that correctional counselors were required to make rounds, including to the SHU, regularly. She explained that at least one counselor visited the SHU every day; she estimated that she walked around the SHU three times per week. With respect to the intake process, Blisset testified that when inmates first arrived at the MCC, they would go through an initial screening process, including receipt of the inmate admissions and orientation ("A&O") handbook. The A&O handbook included information concerning the jail's administrative grievance procedures. (*See* Defs.' Hr'g Ex. 4, MCC Chicago Inmate A&O Handbook, Apr. 24, 2013 ("2013 Handbook") at PVY-000179–80.)[1] Blisset testified that inmates had to sign for their handbooks before they could complete the intake process and that they could not leave the area where that process took place without the handbooks. But she also stated that if DeBenedetto had signed for a handbook, it would be reflected on a form in his file. Blisset had never seen such a form for DeBenedetto. If an inmate lost his A&O handbook, he could ask his correctional counselor for another. Blisset also testified that the handbook was one

---

[1] Prior to the *Pavey* hearing, Defendants submitted into evidence the 2013 Handbook, as well as a copy of the Bureau of Prisons official administrative remedy policy, dated October 5, 2012. (*See* 2013 Handbook; Defs.' Hr'g Ex. 1, Institution Suppl. at PVY-000001–04.) However, because DeBenedetto first entered the MCC in July 2012 (*see* Fifth Am. Compl. ¶ 21), neither of those documents would have applied to him. During the *Pavey* hearing, Defendants sought to enter into evidence a 2010 version of the A&O handbook that they had just obtained from the Bureau of Prisons that morning. (*See* Defs.' Hr'g Ex. 14, MCC Chicago Inmate A&O Handbook, Oct. 25, 2010.) After the hearing, Defendants provided an affidavit from a Bureau of Prisons attorney attesting that the 2010 handbook is a true and accurate copy of the handbook used when DeBenedetto first arrived at the MCC. (*See* Defs.' Resp. to Pl.'s Obj., Ex. A, Decl. of Amy Standefer-Malott ¶ 4, Dkt. No. 169-1.) DeBenedetto has objected to the admission of the 2010 handbook as untimely and improperly authenticated pursuant to Federal Rule of Evidence 901. (*See* Dkt. No. 167.) Alternatively, in the event that the Court admits the 2010 handbook into evidence, DeBenedetto requests sanctions against Defendants. (*See id.*) But the 2010 handbook is not critical to Defendants' argument; nor is it detrimental to DeBenedetto's. The parties have already stipulated that DeBenedetto did not exhaust his administrative remedies in accordance with MCC policy. Additionally, given the admission of the later handbook and testimony that the MCC's procedures did not change significantly over the relevant timeframe, the 2010 handbook does not add much. Accordingly, DeBenedetto's objection to the admission of the A&O handbook is overruled.

of the few items inmates were permitted to take with them when they moved into the SHU. Inmates moving from the general population to the SHU generally were not permitted to take their own items with them. Instead, the jail's lieutenants were responsible for inventorying inmates' belongings and taking them to the SHU. Blisset did not testify as to whether the lieutenants returned DeBenedetto's items to him. In fact, Blisset mentioned that, as a correctional counselor, she would not typically be there during an inmate's transfer from the general population to the SHU.

Blisset also testified as to her role in the MCC's administrative grievance process. Her testimony concerning that process was generally consistent with the information included in the 2013 A&O handbook and the 2012 Bureau of Prisons ("BOP") official policy. (*See* 2013 Handbook at PVY-000179; Defs.' Hr'g Ex. 1, Institution Suppl. at PVY-000001–04.).) First, Blisset testified that she, the correctional counselor, would attempt to resolve an inmate's complaint informally by communicating with the inmate directly or responding to the Inmate Request to Staff form, known as a copout.[2] Next, if the inmate was not satisfied with her resolution of his issue, she would direct him to file the Request for Informal Resolution form, or the BP-8. If the inmate was not satisfied after that point, she would explain to him that the next step was the formal BP-9 form. The 2012 BOP policy and the 2013 A&O handbook both state that inmates must obtain the appropriate grievance forms from their correctional counselors. (*See* 2013 Handbook at PVY-000179; Institution Suppl. at PVY-000001–03.).) Blisset testified that, alternatively, inmates could request the grievance forms via copouts.

In addition to receiving the A&O handbook at intake, according to Blisset, inmates could find the handbook on physical bulletin boards in the law libraries, including in the SHU. She

---

[2] Wright testified that inmates could complete copout forms on their computers or in hard copy. Inmates used copouts to request things like stamps or legal calls.

5

testified that she personally saw the handbook on the TruLincs inmate computer system in the general population. Blisset further testified that, though she had not seen the handbook on the computers in the SHU, she knew it was there because the inmates' computers all had the same information. If inmates were illiterate, disabled, struggled with English, or were otherwise unable to fill out their grievance forms, Blisset or another correctional counselor helped them complete the forms. But she generally would not give inmates the BP-8 or BP-9 grievance forms unless they specifically requested them. As she explained, Blisset did not hand out forms after every inmate complaint because "unfortunately, inmates complain on a daily basis so we literally would be handing out BP-8s every day." Instead, Blisset first tried to resolve issues informally pursuant to the prescribed grievance procedures. She only told inmates about the BP-8s and BP-9s if they were unhappy with the result she reached. Blisset testified that correctional officers—in contrast to correctional counselors—did not carry the grievance forms and could not give them to inmates. Instead, if an inmate complained to or requested forms from a correctional officer, that officer would ideally call a correctional counselor to let them know.

  Wright, like Blisset, testified that as a correctional counselor, he regularly made rounds in the SHU by going cell to cell to check on inmates. He remembered DeBenedetto, describing him as an angry person who had good days and bad days. Wright testified that though he did not recall seeing DeBenedetto go through intake or receive an A&O handbook, every inmate without exception goes through that process. Wright, however, also acknowledged that the orientation process was supposed to be documented and that DeBenedetto's inmate file did not indicate that he had gone through the process. With respect to an inmate transfer from the general population to the SHU, Wright's testimony was again consistent with Blisset's testimony. He stated that transferred inmates could not bring their belongings with them. Instead, other jail officers

inventoried the inmates' possessions and delivered the items that were allowed in the SHU—such as hygienic items, legal papers, a bible, and their A&O handbook—to the inmates later.

Wright also testified that the A&O handbook was on a physical bulletin board in the SHU library and on the TruLincs computer system. But when pressed about whether specific items—such BOP policies—were on the computers, Wright did not provide a definitive answer, instead responding "Why wouldn't they be?" Wright recalled seeing DeBenedetto in the SHU library on the computer many times. He also remembered that DeBenedetto often filled out the electronic or handwritten copout forms required to ask for stamps and legal calls, as explained in the A&O handbook. Wright testified that DeBenedetto never asked him for grievance forms and he never offered DeBenedetto his assistance. When asked if he personally knew that DeBenedetto was mentally disabled, Wright answered, "Well, I'm not a medical doctor so I don't know if it was a mental disability, but I witnessed him being very belligerent, being a racist, all that type of stuff. So if that's what you say that is, that's what I witnessed." But Wright was aware based on DeBenedetto's inmate profile forms that he was considered a "Psychology Alert." (*See* Pl.'s Hr'g Ex. 51, Inmate Profile at 261.) Wright explained that the Psychology Alert would have indicated to him that someone from Psychology Services needed to screen DeBenedetto before the correctional counselors could go anywhere with him.

II. **Dr. Dana's Testimony**

Dr. Dana is the chief of Psychology Services at the MCC, a position he has held since 2010. Prior to that time, Dr. Dana worked as a forensic psychologist at the MCC and as a psychologist at other federal facilities. He has a doctorate in clinical psychology. Dr. Dana remembered DeBenedetto personally and stated that he treated DeBenedetto at the MCC.[3]

---

[3] DeBenedetto objects to Dr. Dana's testimony because Defendants failed to disclose him as an expert. In response, Defendants claim that they are offering Dr. Dana's testimony based on his personal knowledge

7

Dr. Dana testified generally about DeBenedetto's psychological history at the MCC. DeBenedetto's psychological records showed that he suffered from schizophrenia and a concurrent mood disorder with episodes of hypomania. (*See* Pl.'s Hr'g Ex. 41, Oct. 24, 2012 Forensic Report at 3.) Specifically, DeBenedetto experienced significant persecutory delusions. (*Id.*) Dr. Dana testified that DeBenedetto also suffered disturbances such as perseverations (or extreme repetition of a certain word or theme), circumstantial speech, and tangential or derailed thought processes. In Dr. Dana's contemporaneous treatment notes, he wrote that DeBenedetto was often found talking to himself in his cell. (*See* Pl.'s Hr'g Ex. 22, SHU Review, Nov. 8, 2012.) Dr. Dana reported that DeBenedetto had difficulties interacting with professionals, communicating rationally, and staying on one topic of conversation. Dr. Dana's records also explained that DeBenedetto often made inappropriate, racialized comments to African American staff-members. (*See id.*)

Dr. Dana knew that DeBenedetto had been found incompetent to stand trial in his criminal case. He also recommended that DeBenedetto's disciplinary process at the MCC be suspended and instead suggested a behavioral modification plan. Dr. Dana testified that he developed that behavioral plan because when DeBenedetto tried to complain to the guards or escalate his

---

and observations of DeBenedetto—not as an expert. Indeed, even treating healthcare providers like Dr. Dana must be disclosed as experts if they provide expert testimony. *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004). Expert testimony means testimony on a topic beyond what a medical provider observed during the course of treatment. *Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734–35 (7th Cir. 2010). Because there is no evidence that during their treatment relationship, Dr. Dana observed or analyzed whether DeBenedetto could have completed the MCC's grievance procedures, Dr. Dana's opinion on that issue amounts to expert testimony. Generally, if an expert is not properly or timely disclosed, his opinion must be automatically excluded. *See Musser*, 356 F.3d at 758. But when the testimony is not outcome-determinative, district courts have greater discretion. *See id.* As discussed below, the Court's present ruling relies upon Defendants' failure to show that administrative remedies were available to DeBenedetto, not on whether DeBenedetto was mentally capable of complying with the administrative process. So, Dr. Dana's testimony on that point is not dispositive. DeBenedetto's objection is therefore overruled in part and sustained in part. Consistent with Defendants' representation that Dr. Dana is not being offered as an expert, the Court will only consider his testimony about his personal observations of DeBenedetto over the course of their treatment relationship.

complaints, his actions often resulted in disciplinary incident reports. Those incident reports then undermined DeBenedetto's goal to be moved back to the general population. Dr. Dana believed that if he gave DeBenedetto specific individuals to turn to with his complaints, DeBenedetto would have a better chance of moving out of the SHU. But Dr. Dana did not advise DeBenedetto that despite the behavior management plan, he could still submit grievances. Dr. Dana testified that he never suggested DeBenedetto fill out grievance forms or attempted to help DeBenedetto do so.

### III. DeBenedetto's Testimony

DeBenedetto testified that he received the A&O handbook when he first arrived at the MCC in 2012, but that three or four days later, he was moved into the SHU and he never saw the handbook again. DeBenedetto said that he did not read the handbook during those first few days. He denied that officials ever brought his possessions from the general population, including the A&O handbook, to his cell in the SHU.

Consistent with Defendants' account, DeBenedetto recalled submitting numerous copouts while he was at the MCC. He also used the word "grievance" in some of those requests and guessed that he learned the word from other inmates.[4] But DeBenedetto testified that he understood a grievance to be a copout with the word "grievance" written on the heading. As a result, he sometimes attempted to submit copouts as grievances. (*See, e.g.*, Defs.' Hr'g Ex. 6, TruLincs Requests to Staff at PVY-000323.) In addition to sending copouts, DeBenedetto also sent messages to the warden or to the MCC psychologists, asking for legal calls or to be placed back in the general population, but they did not always respond. (*See, e.g.*, Pl.'s Hr'g Ex. 56, TruLincs Requests to Staff at PVY-000334.) DeBenedetto testified that in one instance after he

---

[4] DeBenedetto testified that he occasionally communicated with other inmates in the SHU if he could hear their voices from his cell.

9

sent a copout request to Captain Salas to move him out of SHU (*see* Pl.'s Hr'g Ex. 55, TruLincs Requests to Staff), Captain Salas did not respond in writing but came by DeBenedetto's cell, told him that he was not MCC material, and walked away. DeBenedetto also sent handwritten letters, styled as motions, to the then-Chief Judge for the Northern District of Illinois. (*See, e.g.*, Pl.'s Hr'g Ex. 43, Mot. for Relief in this Matter.) He testified that he believed he would have been able to maneuver the administrative grievance procedure if he had known about it.

DeBenedetto claimed that correctional counselors did not stop by to talk to him on a regular basis. He did not recall a counselor ever knocking on his door in the SHU. He remarked that he only ever saw counselors in the SHU if he happened to be standing at his cell window looking out into the hallway when they walked by.[5] DeBenedetto typically communicated his requests for time in the law library by asking correctional officers when they walked by his cell. According to DeBenedetto, correctional officers walked by his cell at least three times per day. But correctional counselors only walked by once or twice per week. On the first day of the hearing (before Wright's testimony), DeBenedetto testified that he directed several of his copouts to Wright, requesting things like stamps, but that Wright never visited his cell or got back to him. During his first day of testimony, DeBenedetto did not even seem sure as to whether he should be referring to Wright using male or female pronouns. The following day, after Wright testified, DeBenedetto conceded in his rebuttal testimony that it was possible Wright had spoken to him once or twice. DeBenedetto explained that he directed copouts to Wright because he had heard of him and knew that he was the correct person to ask for things such as stamps.

---

[5] DeBenedetto testified that the doors of the cells in the SHU featured a small, closed, glass window, rather than bars. The only way to get the attention of jail officials was to knock or wave at them as they walked by.

**DISCUSSION**

The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust their facility's administrative remedies before bringing civil rights suits concerning prison conditions. *See* 42 U.S.C. § 1997e(a). That requirement is intended to deter frivolous prisoner lawsuits and applies to pretrial detainees like DeBenedetto as well as convicted prisoners. *Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015). The Seventh Circuit takes a "strict compliance approach to exhaustion." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Accordingly, "when administrative procedures are clearly laid out[,] an inmate must comply with them in order to exhaust his remedies." *Roberts v. Neal*, 745 F.3d 232, 235 (7th Cir. 2014) (internal quotation marks and alterations omitted). "Unexhausted claims are procedurally barred from consideration." *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016). But the PLRA does not demand the impossible. *Id.* "Remedies that are genuinely unavailable or nonexistent need not be exhausted." *Id.*

Because failure to exhaust is an affirmative defense, Defendants bear the burden of proof. *Hernandez v. Dart*, 814 F.3d 836, 840 (7th Cir. 2016). "To meet their burden, the defendants must show beyond dispute that remedies were available." *Ramirez v. Young*, 906 F.3d 530, 534 (7th Cir. 2018). The Supreme Court has noted three circumstances in which prisons may have an administrative procedure on the books for inmates to submit grievances but the procedure is nonetheless not "available" under the PLRA. Those circumstances are: (1) the administrative procedure is essentially a "dead end" in which officers consistently fail to provide relief; (2) the procedure is too convoluted for any ordinary prisoner to navigate; and (3) prison officials use threats or other affirmative misconduct to prevent prisoners from taking advantage of the procedure. *See Ross v. Blake*, 136 S. Ct. 1850, 1853–54 (2016). The Seventh Circuit has advised that "these were only examples, not a closed list." *Ramirez*, 906 F.3d at 538. For instance, even if

prison officials do not engage in affirmative misconduct, they may make remedies unavailable by "failing to inform the prisoner of the grievance process." *Hernandez*, 814 F.3d at 842. It cannot be assumed without some evidence that an inmate is aware of the applicable remedies. *Roberts*, 745 F.3d at 235. As a result, "[b]efore dismissing a prisoner's complaint for failure to exhaust, the district court should be able to point to evidence that the relevant administrative procedures were explained in terms intelligible to lay persons." *Ramirez*, 906 F.3d at 535 (internal quotation marks omitted). "That analysis must also account for individual capabilities." *Id.* (citing *Weiss v. Barribeau*, 853 F.3d 873, 875 (7th Cir. 2017) (reversing dismissal for failure to exhaust where the defendants failed to show that the plaintiff suffering from extreme mental illness could maneuver the administrative grievance procedures)). But at the same time, an inmate's subjective unawareness of the procedures does not excuse his obligation to exhaust as "long as the prison has taken reasonable steps to inform the inmates about the required procedures." *Ramirez*, 906 F.3d at 538.

"The purpose of a *Pavey* hearing is to resolve disputed factual questions that bear on exhaustion, including what steps were taken and whether the futility exception might apply." *Wagoner v. Lemmon*, 778 F.3d 586, 591 (7th Cir. 2015). The evidentiary hearing provides an opportunity for the court to consider competing testimony and make credibility determinations. *See Roberts*, 745 F.3d at 234 ("A swearing contest requires an evidentiary hearing to resolve[.]"); *Hicks v. Irvin*, No. 06-cv-645, 2011 WL 2213721, at *7 (N.D. Ill. June 7, 2011) ("At the *Pavey* hearing, a judge is empowered to resolve factual disputes pertaining to exhaustion and to make credibility determinations about the witnesses.").

Here, Defendants rely entirely upon the A&O handbook to demonstrate that they took reasonable steps to inform DeBenedetto of his administrative remedies. While Blisset and Wright

12

both testified that pursuant to MCC intake policies DeBenedetto would have received a copy of the A&O handbook upon his arrival at the jail, neither had personal knowledge as to whether DeBenedetto received it. DeBenedetto acknowledged that he had the handbook at some point—though he had no specific memory of receiving a copy. Overall, the Court is willing to accept DeBenedetto's testimony that he received the handbook, especially since it is consistent with Blisset's and Wright's testimonies. But it is curious that both correctional counselors testified that the MCC required inmates to sign for their handbooks and maintained records of those signatures, yet none was produced for DeBenedetto, who went through the MCC intake process two times. *Cf. Latin v. Johnson*, No. 18 CV 02717, 2019 WL 5208856 at *5 (N.D. Ill. Oct. 16, 2019) (disregarding a jail official's testimony that all inmates must sign a form acknowledging that they know where to find grievance procedures because the plaintiff's form was never entered into evidence).

  Even if DeBenedetto received a copy of the A&O handbook when he first arrived at the MCC, he only stayed in the general population for around three days before his transfer to the SHU. Every witness at the *Pavey* hearing who testified about the transfer agreed that DeBenedetto would not have been permitted to take his belongings with him. Blisset and Wright both testified that under the MCC's policies, DeBenedetto would have received his belongings, including the handbook, from jail lieutenants later. But neither Blisset nor Wright testified as to whether DeBenedetto actually received his handbook back. In fact, Blisset testified that correctional counselors did not even participate in inmate transfers and were not present for that process. Thus, Blisset's and Wright's testimonies as correctional counselors on the transfer process are not as persuasive as DeBenedetto's testimony, who experienced his transfer firsthand. DeBenedetto insisted that he never received the handbook or any of his other possessions. Moreover, his many

13

other attempts to document his complaints are consistent with his assertion that he did not have written instructions concerning the administrative process.

Based on the record before it, the Court finds that after his transfer to the SHU, DeBenedetto never received a copy of the A&O handbook. Unfortunately, that was precisely when DeBenedetto needed information about the grievance process; all of his complaints arose out of his transfer into solitary confinement. While he may have had the handbook for a few days before then, it is not reasonable to expect that he would have known about the grievance procedures based on his possession for only a short period of time. *See Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015) ("The parties agree that [plaintiff] had the 50-page handbook before the incident for less than one day, but the Prison Litigation Reform Act imposed no duty on [him] to memorize it during that time.").

With respect to Defendants' suggestion that the A&O handbook was on the physical bulletin board and the TruLincs system in the SHU computer lab, the Court is not persuaded as to the accuracy of those claims or their significance. Blisset could only testify as to what she saw in the computer labs in the general population. Wright, when pressed, seemed unsure as to what exactly was on the computers. By contrast, DeBenedetto spent hours in the SHU computer lab and described it in vivid detail during his testimony. He had no memory of the handbook being on the bulletin board or the SHU computers. Regardless, the mere presence of the A&O handbook on a computer or bulletin board is of no help if an inmate does not know that the handbook is there, what the handbook contains, or what he should be looking for. *See Ramirez*, 906 F.3d at 538 ("The PLRA does not invite prison and jail staff to pose guessing games for prisoners." (internal quotation marks omitted)); *Hernandez*, 814 F.3d at 842 ("It is not incumbent on the prisoner to divine the availability of grievance procedures." (internal quotation marks omitted)); *Latin*, 2019

14

WL 5208856, at *5 (finding evidence that the inmate handbook containing a description of grievance procedures was on inmate kiosks insufficient, because there was no evidence that the plaintiff was made aware the handbook was there); *Payne v. U.S. Marshals Serv.*, No. 15-cv-5970, 2018 WL 3496094, at *3 (N.D. Ill. July 20, 2018) (explaining that the plaintiff "did not need to scour the Code of Federal Regulations" to find out how to exhaust his administrative remedies); *Lawrence v. Richardson*, No. 1:13-cv-01250-SEB-DML, 2014 WL 3341600, at *5 (S.D. Ind. July 7, 2014) (finding that a slideshow on one channel of the jail's televisions was not sufficient to make inmates aware of administrative remedies because officials did not explain how inmates were supposed to know the slideshow was there). Despite DeBenedetto's many complaints and copouts, there is no evidence that any jail official ever referred him to the A&O handbook.

Because Defendants have not met their burden to prove that they took reasonable steps to make DeBenedetto aware of administrative remedies, DeBenedetto is excused from the PLRA's exhaustion requirement. The Court therefore need not consider whether DeBenedetto could have complied with those procedures if he had been aware of them.

## CONCLUSION

In sum, having considered the evidence adduced at the *Pavey* hearing and the arguments of the parties, the Court concludes that the applicable administrative remedies were not available to DeBenedetto. Thus, he is excused from the exhaustion requirement and his case may proceed. Defendants' request that this action be dismissed for failure to exhaust administrative remedies is accordingly denied.

ENTERED:

Dated: April 29, 2022

Andrea R. Wood
United States District Judge

15